**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3113
_____

JOEL DOE, A Minor, by and through his Guardians
John Doe and Jane Doe; MACY ROE; MARY SMITH;
JACK JONES, A minor, by and through his Parents
John Jones and Jane Jones, CHLOE JOHNSON, A minor
by and through her Parent Jane Johnson; JAMES JONES, A
Minor
by and through his Parents John Jones and Jane Jones
                                             Appellants

v.

BOYERTOWN AREA SCHOOL DISTRICT;
DR. BRETT COOPER, In his official capacity as Principal;
DR. E. WAYNE FOLEY, In his official capacity as Assistant
Principal;
DAVID KREM, Acting Superintendent

PENNSYLVANIA YOUTH CONGRESS FOUNDATION
(Intervenor in D.C.)

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 5-17-cv-01249)
District Judge: Honorable Edward G. Smith
_____

Argued
May 24, 2018
_____

Before: McKEE, SHWARTZ and NYGAARD, *Circuit Judges.*

(Opinion Filed: June 18, 2018)
_____

Cathy R. Gordon, Esq.
Jacob F. Kratt, Esq.
Litchfield Cavo
420 Fort Duquesne Boulevard
One Gateway Center, Suite 600
Pittsburgh, PA 15222

Randall L. Wenger, Esq. **[ARGUED]**
Jeremy L. Samek, Esq.
Independence Law Center
23 North Front Street
Harrisburg, PA 17101

Kellie M. Fiedorek, Esq.
Christiana M. Holcomb, Esq.
Alliance Defending Freedom
440 First Street, N.W.
Suite 600
Washington, D.C. 20001

Gary S. McCaleb, Esq.
Alliance Defending Freedom
15100 North 90th Street
Scottsdale, AZ 85260

    *Attorneys for Appellant*

Michael I. Levin, Esq. **[ARGUED]**
David W. Brown, Esq.
Levin Legal Group, P.C.
1800 Byberry Road, Suite 1301
Huntingdon Valley, PA 19006

    *Attorneys for Appellees*

Mary Catherine Roper, Esq.
American Civil Liberties Union of Pennsylvania
P.O. Box 60173

Philadelphia, PA 19102

Ria Tabacco Mar, Esq. **[ARGUED]**
Leslie Cooper, Esq.
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004

Amanda L. Nelson, Esq.
Cozen O'Connor
45 Broadway, 16th Floor
New York, NY 10006

Harper Seldin, Esq.
Cozen O'Connor
1650 Market Street
One Liberty Place, Suite 2800
Philadelphia, PA 19103

*Attorneys for Intervenor–Appellee*

_____

OPINION OF THE COURT
_____

McKEE, *Circuit Judge*.

This appeal requires us to decide whether the District Court correctly refused to enjoin the defendant School District from allowing transgender students to use bathrooms and locker rooms that are consistent with the students' gender identities as opposed to the sex they were determined to have at birth. The plaintiffs—a group of high school students who identify as being the same sex they were determined to have at birth (cisgender) —believe the policy violated their constitutional rights of bodily privacy, as well as Title IX, and Pennsylvania tort law. As we shall explain, we conclude that, under the circumstances here, the presence of transgender students in the locker and restrooms is no more offensive to constitutional or Pennsylvania-law privacy interests than the

presence of the other students who are not transgender. Nor does their presence infringe on the plaintiffs' rights under Title IX.

In an exceedingly thorough, thoughtful, and well-reasoned opinion, the District Court denied the requested injunction based upon its conclusion that the plaintiffs had not shown that they are likely to succeed on the merits and because they had not shown that they will be irreparably harmed absent the injunction. Although we amplify the District Court's reasoning because of the interest in this issue, we affirm substantially for the reasons set forth in the District Court's opinion.

## I. BACKGROUND
### A. The Setting.

Because such seemingly familiar terms as "sex" and "gender" can be misleading in the context of the issues raised by this litigation, we will begin by explaining and defining relevant terms. Our explanation is based on the District Court testimony of Dr. Scott Leibowitz, an expert in gender dysphoria and gender-identity issues in children and adolescents, and the findings that the District Court made based upon that expert's testimony.

"Sex" is defined as the "anatomical and physiological processes that lead to or denote male or female."[1] Typically, sex is determined at birth based on the appearance of external genitalia.[2]

"Gender" is a "broader societal construct" that encompasses how a "society defines what male or female is within a certain cultural context."[3] A person's gender identity is their subjective, deep-core sense of self as being a particular gender.[4] As suggested by the parenthetical in our opening paragraph, "cisgender" refers to a person who identifies with

---

[1] App. 500.
[2] App. 375.
[3] App. 500.
[4] App. 375.

4

the sex that person was determined to have at birth.[5] The term "transgender" refers to a person whose gender identity does not align with the sex that person was determined to have at birth.[6] A transgender boy is therefore a person who has a lasting, persistent male gender identity, though that person's sex was determined to be female at birth.[7] A transgender girl is a person who has a lasting, persistent female gender identity though that person's sex was determined to be male at birth.[8]

Approximately 1.4 million adults—or 0.6 percent of the adult population of the United States—identify as transgender. [9] Transgender individuals may experience "gender dysphoria," which is characterized by significant and substantial distress as a result of their birth-determined sex being different from their gender identity. [10] Treatment for children and adolescents who experience gender dysphoria includes social gender transition and physical interventions such as puberty blockers, hormone therapy, and sometimes surgery.[11]

"Social gender transition" refers to steps that transgender individuals take to present themselves as being the gender they most strongly identify with. [12] This typically includes adopting a different name that is consistent with that gender and using the corresponding pronoun set, wearing clothing and hairstyles typically associated with their gender identity rather than the sex they were determined to have at birth, and using sex-segregated spaces and engaging in sex-segregated activities that correspond to their gender identity rather than their birth-determined sex. [13] For transgender individuals, an important part of social gender transition is having others perceive them as being the gender the

---

[5] App. 393, 550.
[6] App. 375.
[7] App. 2107.
[8] App. 2107.
[9] App. 376.
[10] App. 376-77, 379.
[11] App. 2110.
[12] App. 2110.
[13] App. 2110.

transgender individual most strongly identifies with.[14] Social gender transition can help alleviate gender dysphoria and is a useful and important tool for clinicians to ascertain whether living in the affirmed gender improves the psychological and emotional function of the individual.[15]

Policies that exclude transgender individuals from privacy facilities that are consistent with their gender identities "have detrimental effects on the physical and mental health, safety, and well-being of transgender individuals."[16] These exclusionary policies exacerbate the risk of "anxiety and depression, low self-esteem, engaging in self-injurious behaviors, suicide, substance use, homelessness, and eating disorders among other adverse outcomes."[17] The risk of succumbing to these conditions is already very high in individuals who are transgender. In a survey of 27,000 transgender individuals, 40% reported a suicide attempt (a rate nine times higher than the general population).[18] Yet, when transgender students are addressed with gender appropriate pronouns and permitted to use facilities that conform to their gender identity, those students "reflect the same, healthy psychological profile as their peers."[19]

Forcing transgender students to use bathrooms or locker rooms that do not match their gender identity is particularly harmful. It causes "severe psychological distress often leading

---

[14] App. 2110.

[15] App. 2111.

[16] Br. for Amici Curiae American Academy of Pediatrics, American Medical Association, et al., 17.

[17] *Id.* at 18 (quoting Am. Psychol. Ass'n & Nat'l Ass'n of Sch. Psychologists, *Resolution on Gender and Sexual Orientation Diversity in Children and Adolescents in Schools* 4 (2015)).

[18] *Id.* at 18–19 (citing Sandy E. James et al., Nat'l Center for Transgender Equality*, Report of the 2015 U.S. Transgender Survey* 114 (2016)).

[19] Br. for Amici Curiae of the National PTA, GLSEN, et al., 7 (citing Lily Durwood et al., *Mental Health and Self Worth in Socially Transitioned Transgender Youth*, 56 J. of the Am. Academy of Child & Adolescent Psychiatry 116, 116 (2017)).

to attempted suicide."[20] The result is that those students "avoid going to the bathroom by fasting, dehydrating, or otherwise forcing themselves not to use the restroom throughout the day." [21] This behavior can lead to medical problems and decreases in academic learning.[22]

We appreciate that there is testimony on this record that the cisgender plaintiffs have also reduced water intake, fasted, etc. in order to reduce the number of times they need to visit the bathroom so they can minimize or avoid encountering transgender students there. For reasons we discuss below, we do not view the level of stress that cisgender students may experience because of appellees' bathroom and locker room policy as comparable to the plight of transgender students who are not allowed to use facilities consistent with their gender identity. Given the majority of the testimony here and the District Court's well-supported findings, those situations are simply not analogous.

Dr. Leibowitz testified that forcing transgender students to use facilities that are not aligned with their gender identities "chips away and erodes at [the individual's] psychological wellbeing and wholeness." [23] It can exacerbate gender dysphoria symptoms by reinforcing that the "world does not

---

[20] Br. for Amici Curiae of the National PTA, GLSEN, et al., 18 (citing Max Kutner, *Denying Transgender People Bathroom Access Is Linked to Suicide*, NEWSWEEK (Dec. 16, 2016); Kristen Clements-Nolle, et al., *Attempted Suicide Among Transgender Persons*: *The Influence of Gender-Based Discrimination and Victimization*, 51 Journal of Homosexuality 53, 63-65 (2006)).

[21] Br. for Amici Curiae of the National PTA, GLSEN, et al., 18 (citing Joseph Kosciw, et al., *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, & Queer Youth in Our Nation's Schools* 12-13, GLSEN (2016)).

[22] *Id.* at 18–19 (citing Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19 J. of Pub. Mgmt. & Soc. Pol'y 65, 74–75 (2013)).

[23] App. 395.

appreciate or understand" transgender students.[24] In short, it is "society reducing them to their genitals."[25] Dr. Leibowitz also noted that "hundreds of thousands of physicians in the United States . . . take the position that individuals with gender dysphoria should not be forced to use a restroom that is not in accordance with their gender identity."[26] We have already noted the disparate suicide rates between transgender and cisgender students.

Prior to the 2016–17 school year, Boyertown Area School District required students at Boyertown Area Senior High School ("BASH") to use locker rooms and bathrooms that aligned with their birth-determined sex.[27] BASH changed this policy in 2016 and for the first time permitted transgender students to use restrooms and locker rooms consistent with their gender identity. In initiating this policy, BASH adopted a very careful process that included student-specific analysis. Permission was granted on a case-by-case basis.[28]

The District required the student claiming to be transgender to meet with counselors who were trained and licensed to address these issues and the counselors often consulted with additional counselors, principals, and school administrators.[29] Once a transgender student was approved to use the bathroom or locker room that aligned with his or her gender identity, the student was required to use only those facilities. The student could no longer use the facilities corresponding to that student's sex at birth.[30]

BASH has several multi-user bathrooms.[31] Each has individual toilet stalls.[32] Additionally, BASH has between four and eight single-user restrooms that are available to all

---

[24] App. 395.
[25] App. 396.
[26] App. 397.
[27] App. 625.
[28] App. 604.
[29] App. 638, 923–25.
[30] App. 931–32.
[31] App. 612.
[32] App. 612–13.

students, depending on the time of day. [33] Four of these restrooms are always available for student use. [34]

The locker rooms at BASH consist of common areas, private "team rooms," and shower facilities. [35] Over the past (approximately) two years, BASH has renovated its locker rooms. The "gang showers" were replaced with single-user showers which have privacy curtains. [36] BASH does not require a student to change in the locker room prior to gym class, although the student must change into gym clothes. [37] A student who is uncomfortable changing in the locker room can change privately in one of the single-user facilities, the private shower stalls, or team rooms. [38]

## B. The Litigation.

Four plaintiffs—proceeding pseudonymously under the names Joel Doe, Jack Jones, Mary Smith, and Macy Roe— sued the District after it changed its bathroom and locker room policy to the policy we have described above. [39] Their claims were based on encounters between some of the plaintiffs and transgender students in locker rooms or multi-user bathrooms. The plaintiffs sought to enjoin BASH's policy of permitting transgender students to use the bathrooms and locker rooms that aligned with their gender identities. They sought a preliminary injunction on three grounds. First, the plaintiffs alleged that the School District's policy violated their constitutional right to bodily privacy. Next, they claimed that the School District's policy violated Title IX of the Education

---

[33] App. 613.
[34] App. 616.
[35] App. 617–19.
[36] App. 619–20.
[37] App. 618–19
[38] App. 618–19.
[39] The plaintiffs included parents and guardians of some of the anonymous students. The District Court provided a detailed recitation of the factual background of this suit, including the particular conduct each plaintiff alleges as the basis for the alleged violation of a privacy interest. *See Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324, 335–64 (E.D. Pa. 2017).

Amendments of 1972 (Title IX).[40] Finally, they alleged that the policy was contrary to Pennsylvania tort law. After discovery and evidentiary hearings, the District Court filed the extensive and well-reasoned opinion we have already referred to, in which it explained that the plaintiffs had not demonstrated that they were likely to succeed on the merits of any of their claims and that plaintiffs had not shown that they would be irreparably harmed absent an injunction.

For reasons the court identified, it concluded that even if the School District's policy implicated the plaintiffs' constitutional right to privacy, the state had a compelling interest in not discriminating against transgender students. The court also determined that the School District's policy was narrowly tailored to serve that interest. Accordingly, the District Court ruled that even if a cisgender plaintiff had been viewed by a transgender student, it would not have violated the cisgender student's constitutional right to privacy. We agree.

The District Court rejected the plaintiffs' Title IX claim for two reasons. First, it found that the School District's policy did not discriminate on the basis of sex, because it applied equally to all students—cisgender male and cisgender female, as well as transgender male and transgender female students—alike. The court also concluded that the plaintiffs had not identified any conduct that was sufficiently serious to constitute Title IX harassment. The mere presence of a transgender student in a locker room should not be objectively offensive to a reasonable person given the safeguards of the school's policy.

For essentially the reasons described above, the District Court also declined to issue an injunction based on the Pennsylvania tort of intrusion upon seclusion. It found that there was insufficient evidence in the record to demonstrate that a transgender student ever viewed a partially clothed plaintiff, and that the presence of a transgender student would not be highly offensive to a reasonable person.

The District Court rejected the plaintiffs' theory of irreparable harm that posited that the plaintiffs were being

---

[40] 86 Stat. 373, as amended 20 U.S.C. § 1681 *et. seq.*

10

forced to give up a constitutional right to use segregated locker rooms and bathrooms. It noted that the School District permitted the students to use the locker room facilities "without limitation."[41] Any student who was uncomfortable being in a state of undress or going to the bathroom with transgender students could use the single-user bathrooms or team rooms that BASH has made available.

Having found that the plaintiffs had no likelihood of success on the merits and did not face irreparable harm, the District Court entered an order on August 25, 2017 denying the injunction. This appeal followed.[42]

## II. DISCUSSION[43]

Preliminary injunctive relief is an "extraordinary remedy."[44] It may be granted only when the moving party shows "(1) a likelihood of success on the merits; (2) that [the movant] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."[45] The movants must establish entitlement to relief by clear evidence.[46] We review the denial

---

[41] *Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d at 410.

[42] Numerous amici filed briefs on behalf of the appellees, and one group filed a brief on behalf of the appellants. At the conclusion of briefing we heard argument. Recognizing the time-sensitive nature of this appeal and the concerns of all of the parents and students in the School District, as well as the District itself, we adjourned to conference to determine if a ruling could be made from the bench. After conferencing, the panel voted to unanimously to affirm the ruling of the District Court. We announced that decision and entered an accompanying order. We now supplement that order with this opinion.

[43] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

[44] *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

[45] *Id.*

[46] *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 22 (2008).

of a preliminary injunction for "an abuse of discretion, an error of law, or a clear mistake in the consideration of proof."[47] We exercise plenary review of the lower court's conclusions of law but review its findings of fact for clear error.[48]

## A. Likelihood of Success on the Merits

The District Court correctly concluded that the appellants were not entitled to an injunction because none of their claims are likely to succeed on the merits.

> <u>The District Court correctly concluded that the appellants' constitutional right to privacy claim was unlikely to succeed on the merits.</u>

The appellants contend that the District Court erroneously concluded they were unlikely to succeed on their claim that the School District's policy violated their constitutional right to privacy. They assert that the District Court (1) failed to recognize the "contours" of the right to privacy; (2) failed to recognize that a policy opening up facilities to persons of the opposite sex necessarily violates that right; (3) erroneously concluded that the School District's policy advanced a compelling interest; and (4) incorrectly found that the policy was narrowly tailored to serve that interest. We reject each of these arguments in turn.

The appellants' challenge to the School District's policy was brought as a civil rights claim pursuant to 42 U.S.C. § 1983. Section 1983 claims can succeed only if the underlying act—here, the alleged exposure of the appellants' partially clothed bodies to transgender students whose birth-determined sex differed from the appellants—violated a constitutional right.[49] When a plaintiff's § 1983 claim is premised on a

---

[47] *Kos Pharm.*, 369 F.3d at 708 (citation omitted).

[48] *Id.* (citations omitted).

[49] *Doe v. SEPTA*, 72 F.3d 1133, 1137 (3d Cir. 1995) ("A § 1983 action cannot be maintained unless the underlying act violates a plaintiff's [c]onstitutional rights.").

violation of the constitutional right to privacy, it will succeed only if it is "limited to those rights of privacy which are fundamental or implicit in the concept of ordered liberty."[50]

The touchstone of constitutional privacy protection is whether the information at issue is "within an individual's reasonable expectations of confidentiality."[51] The Supreme Court has acknowledged two types of constitutional privacy interests rooted in the Fourteenth Amendment—"the individual interest in avoiding disclosure of personal matters" and the "interest in independence in making certain kinds of important decisions."[52] Based on the first principal described above, we have held that a person has a constitutionally protected privacy interest in his or her partially clothed body.[53]

---

[50] *Id.* (quoting *Paul v. Davis*, 424 U.S. 693, 713 (1976) (alterations and internal quotation marks omitted)).

[51] *Doe v. Luzerne County*, 660 F.3d 169, 175 (3d Cir. 2011) (quoting *Malleus v. George*, 641 F.3d 560, 564 (3d Cir. 2011)).

[52] *Id.* (citations omitted).

[53] *Id.* at 177. Other Circuits have come to the same conclusion. *Brannum v. Overton Cty. School Bd.*, 516 F.3d 489, 494, 498 (6th Cir. 2008) (finding a violation of the Fourth Amendment right to privacy when a school surveilled partially clothed middle school students in their locker room, and further noting that this is the "same privacy right . . . located in the Due Process clause"); *Poe v. Leonard*, 282 F.3d 123, 136 (2d Cir. 2002) ("[T]here is a right to privacy in one's unclothed or partially clothed body."); *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963) ("We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed [figure] from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity."). The District Court noted that *Doe v. Luzerne County* did not explicitly hold there was a constitutional right to privacy in an individual's unclothed or partially clothed body. However, by concluding that Doe had a reasonable expectation of privacy and remanding the case to determine the exact contours of that right, we implicitly recognized that such a privacy right exists. The District Court assumed the existence of the right, and the parties seemingly agreed that the right exists. If there

The appellants advance two main arguments in support of their contention that their right to privacy was violated by the School District's policy of permitting transgender students to use bathrooms and locker rooms that aligned with their gender identities. Neither is persuasive.

First, the appellants claim that their right to privacy was violated because the policy permitted them to be viewed by members of the opposite sex while partially clothed. [54] Regardless of the degree of the appellants' undress at the time of the encounters, the District Court correctly found that this would not give rise to a constitutional violation because the School District's policy served a compelling interest—preventing discrimination against transgender students—and was narrowly tailored to that interest.

The constitutional right to privacy is not absolute.[55] It must be weighed against important competing governmental interests. [56] Only unjustified invasions of privacy by the government are actionable in a § 1983 claim.[57] That is, the constitution forbids governmental infringement on certain fundamental interests unless that infringement is sufficiently

---

were any doubt after *Doe v. Luzerne County* that the constitution recognizes a right to privacy in a person's unclothed or partially clothed body, we hold today that such a right exists.

[54] *See* Br. for Appellants, 18 ("The privacy interest is vitiated when a member of one sex is viewed by a member of the opposite sex." (citation omitted)).

[55] *Doe v. SEPTA*, 72 F.3d at 1138.

[56] *Doe v. Luzerne County*, 660 F.3d at 178; *Sterling v. Borough of Minersville*, 232 F.3d 190, 195 (3d Cir. 2000) ("In examining right to privacy claims, we, therefore, balance a possible and responsible government interest in disclosure against the individual's policy interest.").

[57] *See Doe v. SEPTA*, 72 F.3d at 1138 (citing *Whalen v. Roe*, 429 U.S. 589, 602 (1977)); *see also Olmstead v. United States*, 277 U.S. 438, 478–79 (1928) (Brandies, J., dissenting) ("every *unjustifiable* intrusion upon the privacy of an individual . . . must be deemed a [constitutional] violation" (emphasis added)).

14

tailored to serve a compelling state interest.[58] The District Court found that the School District's policy served "a compelling state interest in not discriminating against transgender students" and was narrowly tailored to that interest.[59] We agree.

As set forth in detail above, transgender students face extraordinary social, psychological, and medical risks and the School District clearly had a compelling state interest in shielding them from discrimination. There can be "no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity."[60] The risk of experiencing substantial clinical distress as a result of gender dysphoria is particularly high among children and may intensify during puberty.[61] The Supreme Court has regularly held that the state has a compelling interest in protecting the physical and psychological well-being of minors.[62] We have

---

[58] *Reno v. Flores*, 507 U.S. 292, 301–02 (1993). The District Court found that this "compelling interest" analysis was the appropriate level to review BASH's policy. *Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d at 390 (citing *Reno*, 507 U.S. at 302). The parties do not explicitly challenge this choice. Br. for Appellants, 27-33; Br. for Appellees, 30; Br. for Intervenor-Appellee, 36. In other privacy-rights contexts, we have found that an "intermediate standard of review" was appropriate, and that the "more stringent 'compelling interest analysis' would be used when the intrusion on an individual's privacy was severe." *Doe v. SEPTA*, 72 F.3d at 1139–40. Because we hold that BASH's policy survives the more stringent standard of review, we need not decide which standard of review is appropriate here.

[59] *Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d at 390.

[60] *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034, 1051 (7th Cir. 2017).

[61] App. 2276–78.

[62] *See Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 125 (1989) ("We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not obscene by adult standards."); *Ginsberg v. New York,* 390 U.S. 629, 640 (1968) (a state "has an independent interest in

15

similarly found that the government has a compelling interest in protecting and caring for children in various contexts.[63] Mistreatment of transgender students can exacerbate gender dysphoria, lead to negative educational outcomes, and precipitate self-injurious behavior. When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening. This record clearly supports the District Court's conclusion that the School District had a compelling state interest in protecting transgender students from discrimination.

Moreover, the School District's policy fosters an environment of inclusivity, acceptance, and tolerance. As the appellees' amicus brief from the National Education Association convincingly explains, these values serve an important educational function for both transgender and cisgender students.[64] When a school promotes diversity and inclusion, "classroom discussion is livelier, more spirited, and simply more enlightening and interesting [because] the students have the greatest possible variety of backgrounds."[65] Students in diverse learning environments have higher academic achievement leading to better outcomes for all students.[66] Public education "must prepare pupils for

---

the well-being of its youth"); *New York v. Ferber,* 458 U.S. 747, 756–57 (1982) ("It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" (quoting *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607 (1982))).

[63] *See, e.g.*, *Croft v. Westmoreland Cty. Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997) (noting that the government has a compelling interest in the "protection of children," and in protecting children from abuse).

[64] Br. for Amicus Curiae National Education Association, 7–11.

[65] *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003).

[66] Br. for Amicus Curiae National Education Association, 9–10 (citing Stephen Brand et al., *Middle School Improvement and Reform: Development and Validation of a School- Level Assessment of Climate, Cultural Pluralism and School Safety*, 95 J. Educ. Psychol. 570, 571 (2003); John Rosales, *Positive School Cultures Thrive When Support Staff Included*, NEA

citizenship in the Republic,"[67] and inclusive classrooms reduce prejudices and promote diverse relationships which later benefit students in the workplace and in their communities.[68] Accordingly, the School District's policy not only serves the compelling interest of protecting transgender students, but it benefits all students by promoting acceptance.

As we have already noted, we do not intend to minimize or ignore testimony suggesting that some of the appellants now avoid using the restrooms and reduce their water intake in order to reduce the number of times they need to use restrooms under the new policy. Nor do we discount the surprise the appellants reported feeling when in an intimate space with a student they understood was of the opposite biological sex.[69] We cannot, however, equate the situation the appellants now face with the very drastic consequences that the transgender students must endure if the school were to ignore the latter's needs and concerns. Moreover, as we have mentioned, those cisgender students who feel that they must try to limit trips to the

---

Today (Jan. 10, 2017); N. Eugene Walls et al. *Gay-Straight Alliances and School Experiences of Sexual Minority Youth*, 41 Youth & Soc'y 307, 323-25 (2010); Stephen T. Russell, *Are School Policies Focused on Sexual Orientation and Gender Identity Associated with Less Bullying? Teachers' Perspectives*, 54 J. Sch. Psychol. 29 (2016)).

[67] *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986) (citation omitted).

[68] Br. for Amicus Curiae National Education Association, 10 (citing Jeanne L. Reid & Sharon Lynn Kagan, *A Better Start: Why Classroom Diversity Matters in Early Education* 9 (Apr. 2015)).

[69] App. 276, 1943. To the extent that the appellants' claim for relief arises from the embarrassment and surprise they felt after seeing a transgender student in a particular space, they are actually complaining about the implementation of the policy and the lack of pre-implementation communication. That is an administrative issue, not a constitutional one. To the extent that the appellants are expressing discomfort being around students whom they define as different from themselves, that discomfort does not implicate a privacy interest, even when viewed through the lens of strict scrutiny.

17

restroom to avoid contact with transgender students can use the single-user bathrooms in the school.

Assuming the policy is subject to strict scrutiny, it must advance a compelling state interest and the means of achieving that interest must be "specifically and narrowly framed to accomplish that purpose." [70] Having correctly identified a compelling state interest, the District Court correctly held that the School District's policy was narrowly tailored. The appellants contend that "a much more tailored solution is to provide single-user accommodations."[71] They reason that "all students would be allowed to access the individual facilities, [so] no stigma would attach to the professed transgender students' using them, and preserving the sex-specific communal facilities to single-sex use would resolve all privacy concerns."[72]

This argument is not only unpersuasive, it fails to comprehend the depths of the problems the School District's policy was trying to remedy or the steps taken to address them. The School District already provides single-user accommodations for all students. Any student who is uncomfortable changing around their peers in private spaces, whether transgender or cisgender, may change in a bathroom stall, single-user bathroom, or the private team rooms.[73] The appellants seemingly admit that these accommodations "resolve all privacy concerns."[74] Yet they insist that the policy should be changed to require that transgender students use individual bathrooms if they do not wish to use the communal facilities that align with their birth-determined sex. Not only would forcing transgender students to use single-user facilities or those that correspond to their birth sex not serve the compelling interest that the School District has identified here, it would significantly undermine it.[75] As the Court of Appeals

---

[70] *Grutter*, 539 U.S. at 333 (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 (1996)).

[71] Br. for Appellants, 32.

[72] *Id.*

[73] App. 618–19.

[74] Br. for Appellants, 32.

[75] *See* Br. for Amici Curiae American Academy of Pediatrics et al., 17–18. ("[F]orcing transgender students to use separate

for the Seventh Circuit has recognized, a school district's policy that required a transgender student to use single-user facilities "actually invited more scrutiny and attention from his peers." [76] Adopting the appellants' position would very publicly brand all transgender students with a scarlet "T," and they should not have to endure that as the price of attending their public school.

Nothing in the record suggests that cisgender students who voluntarily elect to use single-user facilities to avoid transgender students face the same extraordinary consequences as transgender students would if they were forced to use them. As we explain more fully below, requiring transgender students to use single user or birth-sex-aligned facilities is its own form of discrimination.

It is therefore clear that the District Court was correct in concluding that the appellants are unlikely to succeed in establishing a violation of their right to privacy based on a transgender student potentially viewing them in a state of undress in a locker room or restroom. The challenged policy is narrowly tailored to serve a compelling governmental interest. There is no constitutional violation.

The appellants also urge us to recognize constitutional privacy protections for alleged violations that resulted from conduct other than being viewed by transgender students in a locker room or bathroom. They assert that "government actors cannot force minors to endure *the risk* of unconsented intimate exposure to the opposite sex as a condition for using the very facilities set aside to protect their privacy."[77] They claim that their constitutional privacy rights were violated "when the sexes intermingle[d]" in the bathrooms and locker rooms.[78] They also argue that the female appellants' privacy rights are violated if they are forced to attend to their menstrual hygiene in a facility where members of the opposite sex may potentially

---

facilities sends a stigmatizing message that can have a lasting and damaging impact on the health and well-being of the young person.").

[76] *Whitaker*, 858 F.3d at 1045.

[77] Br. for Appellants, 18 (emphasis added).

[78] *Id.* at 27.

be present. [79] In other words, they contend that their constitutional right to privacy is necessarily violated because they are forced to share bathrooms and locker rooms with transgender students whose gender identities correspond with the sex-segregated space, but do not do not align with their birth sex.

We reject the premise of this argument because BASH's policy does not force any cisgender student to disrobe in the presence of any student—cisgender or transgender. BASH has provided facilities for any student who does not feel comfortable being in the confines of a communal restroom or locker room. BASH has installed privacy stalls and set some bathrooms aside as single-user facilities so that any student who is uneasy undressing or using a restroom in the presence of others can take steps to avoid contact. BASH's policy does not compel a privacy violation for any student.

In any event, we decline to recognize such an expansive constitutional right to privacy—a right that would be violated by the presence of students who do not share the same birth sex. Moreover, no court has ever done so. As counsel for the School District noted during oral argument, the appellants are claiming a very broad right of personal privacy in a space that is, by definition and common usage, just not that private. School locker rooms and restrooms are spaces where it is not only common to encounter others in various stages of undress, it is expected. The facilities exist so that students can attend to their personal biological and hygienic needs and change their clothing. As the Supreme Court has stated, "[p]ublic school locker rooms . . . are not notable for the privacy they afford."[80]

Thus, we are unpersuaded to the extent that the appellants' asserted privacy interest requires protection from the risk of encountering students in a bathroom or locker room whom appellants identify as being members of the opposite sex. As the Seventh Circuit noted in *Whitaker* "[a] transgender student's presence in the restroom provides no more of a risk

---

[79] *Id.* at 26. We note that the appellants do not allege that the female plaintiffs ever actually tended to their periods in the presence of a transgender female student.

[80] *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995).

20

to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at his or her classmates performing their bodily functions."[81]

None of the cases cited by the appellants is to the contrary. [82] For example, in their brief and at argument, they placed substantial reliance on *Faulkner v. Jones*[83] for the proposition that "society [has] undisputed[ly] approv[ed] separate public restrooms for men and women based on privacy concerns. The need for privacy justifies separation . . . ."[84] But that case did not recognize a constitutional mandate that bathrooms and locker rooms must be segregated by birth-determined sex. Although it acknowledged that privacy concerns *may* justify separate facilities for men and women in certain circumstances,[85] it did not hold that the Constitution *compels* separate bathroom facilities. Moreover, as we have explained and as the District Court more thoroughly described, BASH has carefully crafted a policy that attempts to address the concerns that some cisgender students may have. To its credit, it has done so in a way that recognizes those concerns as well as the needs, humanity, and decency of transgender students.

The appellants' reliance on *Chaney v. Plainfield Healthcare Center*[86] is similarly unconvincing. That was an appeal from a Title VII suit brought against a nursing home after a Black nursing assistant was fired for protesting a patient's demand that he receive care only from White nursing aids.[87] The court distinguished medical care based on race

---

[81] *Whitaker*, 858 F.3d at 1052.

[82] Br. for Appellee, 15–31.

[83] 10 F.3d 226 (4th Cir. 1993).

[84] Br. for Appellants, 17 (alterations added) (quoting *Faulkner*, 10 F.3d at 232).

[85] *Faulkner*, 10 F.3d at 232 ("In the end, distinctions in any separate facilities provided for males and females may be based on real differences between the sexes, both in quality and quantity, so long as the distinctions are not based on stereotyped or generalized perceptions of differences.").

[86] 612 F.3d 908, 913 (7th Cir. 2010).

[87] *Chaney*, 612 F.3d at 910–12.

from medical care based on sex, noting that just as "the law tolerates same-sex restrooms or same-sex dressing rooms . . . to accommodate privacy needs, Title VII allows an employer to respect a preference for same-sex health providers, but not same-race providers."[88] Like *Faulkner*, *Chaney* held that the Constitution *tolerates* single-sex accommodations. It did not hold that the constitution *demands* it.

Equally unpersuasive is the appellants' reliance on cases discussing far more intrusive invasions of privacy than allowed by BASH's policy. Cases about strip searches[89] and a criminal conviction for voyeurism after a person repeatedly looked at women in the stalls of public restrooms[90] are wholly unhelpful to our analysis. Those cases involve inappropriate conduct as well as conduct that intruded into far more "intimate aspects of human affairs" than here.[91] There is simply nothing inappropriate about transgender students using the restrooms or locker rooms that correspond to their gender identity under the policy BASH has initiated, and we reject appellants' attempt to argue that there is. Appellants do not contend that transgender Students A or B did anything remotely out of the ordinary while using BASH's facilities. Indeed, the appellants' privacy complaint is not with transgender students' conduct, but with their mere presence. We have already explained that the presence of transgender students in these spaces does not offend the constitutional right of privacy any more than the presence of cisgender students in those spaces.

In an argument that completely misses (or deliberately ignores) the reason for the disputed policy or the circumstances it addresses, the appellants insist that it is improper to consider a student's transgender status when conducting this privacy analysis and that we must only look at the student's anatomy.[92] We disagree. Constitutional right to privacy cases "necessarily

---

[88] *Id.* at 913.

[89] *Canedy v. Boardman*, 16 F.3d 183, 185–86, 188 (7th Cir. 1994).

[90] *State v. Lawson*, 340 P.3d 979 (Wash. App. 2014).

[91] *Doe v. Luzerne County*, 660 F.3d at 176 (quoting *Nunez v. Pachman*, 578 F.3d 228, 232 (3d Cir. 2009)).

[92] Br. for Appellants, 10–12.

require fact-intensive and context-specific analyses."[93] Bright line rules cannot be drawn.[94] Put simply—the facts of a given case are critically important when assessing whether a constitutional right to privacy has been violated. A case involving transgender students using facilities aligned with their gender identities after seeking and receiving approval from trained school counselors and administrators implicates different privacy concerns than, for example, a case involving an adult stranger sneaking into a locker room to watch a fourteen year-old girl shower. The latter scenario—taken from a case the appellants rely upon[95]— is simply not analogous to the circumstances here.

> 1. The District Court correctly concluded that the appellants' Title IX claim was unlikely to succeed on the merits.

The District Court rejected the appellants' Title IX claim because the School District's policy treated all students equally and therefore did not discriminate on the basis of sex, and because the appellants had failed to meet the elements of a "hostile environment harassment" claim. We again agree. We also agree with the School District's position that barring transgender students from restrooms that align with their gender identity would itself pose a potential Title IX violation.

Title IX prohibits discrimination based on sex in all educational programs that receive funds from the federal government.[96] However, discrimination with regard to privacy facilities is exempt from that blanket prohibition. An institution "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."[97] This exception is

---

[93] *Doe v. Luzerne County*, 660 F.3d at 176.

[94] *Id.*

[95] *People v. Grunau*, No. H015871, 2009 WL 5149857 (Cal. Ct. App. Dec. 29, 2009) (unpublished memorandum opinion).

[96] 20 U.S.C. § 1681(a).

[97] 34 C.F.R. § 106.33.

permissive—Title IX does not require that an institution provide separate privacy facilities for the sexes.

Title IX also supports a cause of action for "hostile environment harassment." [98] To recover on such a claim, a plaintiff must establish sexual harassment that is so severe, pervasive, or objectively offensive and that "so undermines and detracts from the victims' educational experience that [he or she] is effectively denied equal access to an institution's resources and opportunities." [99] To support a claim of hostile environment harassment, a plaintiff must demonstrate that the offensive conduct occurred because of his or her sex. [100]

Title IX's "hostile environment harassment" cause of action originated in a series of cases decided under Title VII of

---

[98] *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 n.14 (3d Cir. 2008) (citation omitted).

[99] *Id.* (alterations in original) (citation omitted). We recently noted that we have not always been consistent in stating whether a plaintiff claiming sexual harassment must prove the harassment was "severe *or* pervasive" or "severe *and* pervasive." *Castleberry v. STI Grp.*, 863 F.3d 259, 263–64 (3d Cir. 2017) (emphasis added). Much of the confusion stems from the fact that the Supreme Court has used both the conjunctive and the disjunctive to describe the plaintiff's burden. *Compare Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) ("For sexual harassment to be actionable, it must be sufficiently severe or pervasive . . . ."), *with Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999) (concluding that an action for Title IX harassment "will lie only for harassment that is so severe, pervasive and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit"). In *Castleberry*, we concluded that the "correct standard is severe *or* pervasive. *Castleberry*, 863 F.3d at 264. Accordingly, we will proceed using the disjunctive inquiry here.

[100] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (holding, in the Title VII context, that a plaintiff "must always prove that the conduct at issue . . . constituted *discrimination* because of . . . sex." (internal quotations omitted)).

the Civil Rights Act of 1964 ("Title VII").[101] The Supreme Court has "extended an analogous cause of action to students under Title IX."[102] Title VII cases are therefore instructive.[103]

Title VII prohibits employers from discriminating based on sex.[104] In *Oncale*, the Supreme Court considered whether Title VII prohibited "discrimination because of sex" when the harasser and the harassed employee were the same sex.[105] In concluding that Title VII could support such a claim, the Court held that Title VII is concerned only with "discrimination because of sex."[106] It noted that the Court had never held that "workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."[107] Rather, "the critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."[108] The plaintiffs in a Title VII action must therefore always "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex."[109] The same requirement holds true for Title IX claims.

The appellants have not provided any authority—either in the District Court or on appeal—to suggest that a sex-neutral policy can give rise to a Title IX claim. Instead, they simply

---

[101] 42 U.S.C. § 2000e *et seq.*

[102] *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 205 (3d Cir. 2001).

[103] *Id.* Courts have frequently looked to Title VII authority for guidance with Title IX cases. *See, e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX." (collecting cases)).

[104] 42 U.S.C. § 2000e-2.

[105] *Oncale*, 523 U.S. at 76.

[106] *Id.* at 80.

[107] *Id.*

[108] *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).

[109] *Id.* at 81 (internal alterations, emphasis, and quotation marks omitted).

hypothesize that "harassment" that targets both sexes equally would violate Title IX; that is simply not the law.[110] The touchstone of both Title VII and Title IX claims is disparate treatment *based on sex*.[111] The School District's policy allows all students to use bathrooms and locker rooms that align with their gender identity. It does not discriminate based on sex, and therefore does not offend Title IX.

The District Court also correctly found that the appellants had not met their burden of establishing that the mere presence of transgender students in bathrooms and locker rooms constitutes sexual harassment so severe, pervasive, or objectively offensive and "that so undermines and detracts from the victims' educational experience that [the plaintiff] is effectively denied equal access to an institution's resources and opportunities."[112] That is particularly true given the many safeguards the School District put in place as part of the challenged policy.

Rather than relying on relevant legal authority to establish that the mere presence of a transgender student in a locker room or bathroom rises to the level of harassment, the appellants again cite inapposite cases that involve egregious harassment. That is not surprising since we have found no authority that supports the appellants' claims. Two cases that the appellants attempt to analogize to their situation are particularly illustrative of the weakness of their position—

---

[110] *See Pasqual v. Metro. Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996) ("Harassment that is inflicted without regard to gender, that is, where males and females in the same setting do not receive disparate treatment, is not actionable because the harassment is not based on sex."); *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982) ("[T]here may be cases in which a supervisor makes sexual overtures of both sexes or where the conduct complained of is equally offensive to male and female workers. In such cases, [the] harassment would not be based on sex because men and women are accorded like treatment . . . and the plaintiff would have no remedy under Title VII.").

[111] *Oncale*, 523 U.S. at 80.

[112] *DeJohn*, 537 F.3d at 316 n.14 (citations omitted).

*Lewis v. Triborough Bridge and Tunnel Authority* [113] and *Schonauer v. DCR Entertainment Inc.* [114] *Lewis* involved harassment that is worlds apart from anything in the present record. There, cisgender men not only entered a locker room while cisgender female employees were changing, they "leer[ed]" at them, "crowd[ed] the entrance to the locker room, forcing [them] to 'run the gauntlet[,]' and brush[ed] up against them."[115] When a supervisor was informed, he referred to the female employees as "cunts" and "the biggest bunch of fucking crybabies." [116] Any comparison to the circumstances the appellants face here is patently frivolous.

*Schonauer* is also distinguishable. There, the plaintiff was employed as a beverage server at a topless nightclub and alleged that she had been harassed by a manager.[117] In addition to entering the women's changing facility, the manager repeatedly encouraged the plaintiff to enter nude dance contests, asked questions about her sexual fantasies, and probed her sexual history.[118] When the plaintiff resisted these advances, she was fired.[119] The Washington Court of Appeals found that this behavior could constitute harassment not simply because the manager entered the changing facility, but because he pressed the plaintiff to "provide sexually explicit information and to dance on stage in a sexually provocative way."[120]

The District Court no doubt realized that the appellants' attempt to seize upon *Lewis* and *Schonauer* demonstrated the weakness of their arguments. Here, there are no allegations of harassment, let alone any that are even remotely as "severe, pervasive, [or] objectively offensive."[121] Still, the appellants

---

[113] 77 F. Supp. 2d 376, 377–78 (S.D.N.Y. 1999).

[114] 905 P.2d 392, 396–97, 400–01 (Wash. Ct. App. 1995).

[115] 77 F. Supp. 2d at 377.

[116] *Id*. at 378.

[117] *Schonauer*, 905 P.2d at 396.

[118] *Id.* at 396–97.

[119] *Id.* at 397.

[120] *Id.* at 400.

[121] *DeJohn*, 537 F.3d at 316 n.14; *Castleberry*, 863 F.3d at 264.

unconvincingly try to equate mere presence in a space with harassing activity.

This case is far more analogous to *Cruzan v. Special School Dist., No. 1*,[122] a Title VII case from the Court of Appeals for the Eighth Circuit. *Cruzan* held that a transgender individual in a bathroom did not create a hostile environment because there was no evidence that the individual "engaged in any inappropriate conduct other than merely being present in the women's faculty restroom."[123] That is, a transgender person in a restroom did not create an environment that was "permeated with discriminatory intimidation, ridicule, and insult" as required to sustain a harassment claim under Title VII.[124] We agree with the Eight Circuit's conclusion. As we have emphasized, the appellants' real objection is to the presence of transgender students, not to any "environment" their presence creates. Indeed, the allegations here include an assertion that a cisgender student was harassed merely by a transgender student washing that student's own hands in a bathroom or changing in a locker room. That is not the type of conduct that supports a Title IX hostile environment claim.[125] The District Court recognized this and correctly ruled that this claim was unlikely to succeed.

The School District, on the other hand, contends that barring transgender students from using privacy facilities that align with their gender identity would, itself, constitute discrimination under a sex-stereotyping theory in violation of Title IX.[126] We need not decide that very different issue here. We note only that the School District's argument finds support in the very persuasive opinion from the Seventh Circuit in *Whitaker,* and the analysis there supports the District Court's conclusion that appellants were not likely to succeed on the merits of their Title IX claim.

---

[122] 294 F.3d 981, 984 (8th Cir. 2002).

[123] *Id.*

[124] *Id.* (citation omitted).

[125] This is not to say that the transgender students could not engage in conduct that would rise to the level of harassment. It would be the same conduct required for cisgender students to harass someone.

[126] Br. for Appellees, 38–40.

In *Whitaker*, a transgender boy sued the Kenosha Unified School District for prohibiting him from using the boys' bathrooms and locker room.[127] He alleged that Kenosha's policy violated Title IX and denied him equal protection.[128] The District Court agreed and the school district appealed.[129] The Court of Appeals for the Seventh Circuit affirmed, finding that Kenosha's policy constituted sex-based discrimination.

Specifically, *Whitaker* held that Kenosha's policy violated Title IX because it discriminated against transgender people based on their failure to conform to sex stereotypes.[130] "By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth."[131] Accordingly, Kenosha's policy subjected Whitaker, "as a transgender student, to different rules, sanctions, and treatment than non-transgender students, in violation of Title IX."[132] The court also dismissed Kenosha's argument that gender-neutral bathroom alternatives were sufficient because such a policy would itself violate the Act.[133]

*Whitaker* explained that the Supreme Court has adopted an expansive view of "sex" under Title VII.[134] Rather than limit the definition of sex to one's anatomy, a plurality of the Supreme Court held in *Price Waterhouse* that Title VII "intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes."[135] The Supreme Court reiterated Title VII's broad view of "sex" in *Oncale*, wherein Justice Scalia wrote that "statutory provisions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concern of our legislators by which we

---

[127] *Whitaker*, 858 F.3d at 1042.

[128] *Id.*

[129] *Id.* at 1042–43.

[130] *Id.* at 1048–49.

[131] *Id.* at 1048.

[132] *Id.* at 1049–50.

[133] *Id.* at 1049–50

[134] *Id.* at 1048.

[135] *Id.* at 1047–48 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (plurality)).

are governed." [136] *Whitaker* noted that, following *Price Waterhouse*, many courts (including the Third Circuit) have recognized a cause of action under Title VII when an employee faces discrimination for failing to conform to sex stereotypes. [137]

The injunction that the appellants have requested here would essentially have replicated the Kenosha policy. The Boyertown Area School District can hardly be faulted for being proactive in adopting a policy that avoids the issues that would have otherwise arisen under Title IX. Contrary to the appellants' assertions, "sex" has not been narrowly limited to a person's anatomy under Title VII—nor by analogy is it so limited under Title IX.

This conclusion is a natural extension of our decision in *Prowel v. Wise Business Forms, Inc*, where we recognized that a plaintiff can state a claim under Title VII for sexual discrimination based on gender stereotyping. [138] While *Prowel* did not involve a transgender person, we did consider whether a man who did not adhere to male gender stereotypes could state a claim for sex discrimination under Title VII. [139] Relying on *Price Waterhouse*, we held that Title VII's prohibition on discrimination "because of sex" also prohibited discriminating against someone who did not conform to gender stereotypes. [140]

Title IX prohibits discrimination against transgender students in school facilities just as Title VII prohibited discrimination against Prowel in the workplace. Therefore a court may not issue an injunction that would subject the

---

[136] *Id.* at 1048 (quoting *Oncale*, 523 U.S. at 79).

[137] *Id.* (citing *Doe v. City of Belleville*, 119 F.3d 563, 580–81 (7th Cir. 1997), *vacated on other grounds*, 523 U.S. 1001 (1998); *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 263–64 (3d Cir. 2001); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874–75 (9th Cir. 2001); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 n.4 (1st Cir. 1999)).

[138] 579 F.3d 285 (3d Cir. 2009).

[139] *Prowel*, 579 F.3d at 287.

[140] *Id.* at 290–92.

transgender students to different conditions than their cisgender peers are subjected to.

We are not alone in reaching this conclusion. In addition to the Seventh Circuit's decision in *Whitaker*, the Courts of Appeals for the Eleventh and Sixth Circuits have concluded that discriminating against transgender individuals constitutes sex discrimination.[141] Similarly, the First Circuit has relied on Title VII in holding that a person may state a claim under the Equal Credit Opportunity Act, which prohibits discrimination "with respect to . . . sex[,]" if that person does not conform to sex stereotypes.[142] The Ninth Circuit has also looked to Title VII and held that a transgender female inmate who did not conform to sex stereotypes could state a claim under the Gender Motivated Violence Act.[143]

We therefore hold that the District Court correctly declined to issue an injunction based on the appellants' Title IX claim.

---

[141] *Glenn v. Brumby*, 663 F.3d 1312, 1316–17 (11th Cir. 2011) (holding that a "person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes . . . . Accordingly, discrimination against a transgender individual because of her gender-nonconformity is sex discrimination"); *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004) (holding that sex discrimination under Title VII "encompasses both the biological differences between men and women, and gender discrimination, that is, discrimination based on a failure to conform to stereotypical gender norms").

[142] *Rosa v. Park West Bank & Tr. Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000) (holding that the plaintiff, a birth-assigned male whose "attire did not accord with his male gender," could state a claim if a banker did not give him a loan).

[143] *Schwenk v. Hartford*, 204 F.3d 1187, 1200, 1202 (9th Cir. 2000) ("Congress intended proof of gender motivation under the GMVA to proceed in the same way that proof of discrimination on the basis of sex or race is shown under Title VII . . . . '[S]ex' under Title VII encompasses both sex—that is, the biological difference between men and women—*and* gender.").

2. <u>The District Court correctly concluded that the appellants' state law tort claim was unlikely to succeed on the merits.</u>

Finally, the appellants contend that the District Court erred in denying the injunction as to their Pennsylvania-law tort claim for intrusion upon seclusion. Pennsylvania has adopted the Second Restatement of Torts' definition of intrusion upon seclusion:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.[144]

In denying this claim, the District Court concluded that the mere presence of a transgender individual in a bathroom or locker room is not the type of conduct that would be highly offensive to a reasonable person. As we have noted, students in a locker room expect to see other students in varying stages of undress, and they expect that other students will see them in varying stages of undress. We will affirm the District Court's rejection of the appellants' tort claim.

## B. Irreparable Harm

In addition to finding that the appellants were unlikely to succeed on the merits of their claims, the District Court denied injunctive relief because they had not demonstrated that the failure to issue an injunction would result in irreparable harm. The District Court found that:

---

[144] *Tagouma v. Investigative Consultant Servs, Inc.*, 4 A.3d 170, 174 (Pa. Super. Ct. 2010) (quoting Restatement (Second) of Torts § 652B (1965)).

On a practical level . . . the privacy protections that are in place at BASH, which include the bathroom stalls and shower stalls in the locker rooms, the bathroom stalls in the multi-user bathrooms, the availability of a number of single-user bathrooms (a few of which will have lockers for storing items), the [ability] of students to store personal items in their locker or leave those items with the gym teacher, and the availability of the team rooms in the locker rooms (which would not involve students passing through the common area of the locker room), and the overall willingness of the [appellees] to work with the students and their families to assure that the students are comfortable at BASH, mitigates against a finding of irreparable harm. . . . The privacy protections available to students in 2017-18 are more than suitable to address any privacy concerns relating to the presence of transgender students in the locker rooms and bathrooms at BASH.[145]

We agree that the appellants did not demonstrate irreparable harm would result from denying an injunction. The School District has provided adequate privacy facilities for the appellants to use during this litigation. Even if the appellants could otherwise succeed on one or more of their claims (and, as explained above, we do not suggest that they can), the single-user facilities ensure that no appellant faces irreparable harm in the meantime.

---

[145] *Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp 3d. at 410.

## III. CONCLUSION

The Boyertown Area School District has adopted a very thoughtful and carefully tailored policy in an attempt to address some very real issues while faithfully discharging its obligation to maintain a safe and respectful environment in which everyone can both learn and thrive.

The District Court correctly concluded that the appellants' attempt to enjoin that policy based on an alleged violation of their privacy rights and their rights under Title IX and Pennsylvania tort law is not likely to succeed on the merits. The District Court was also correct in deciding that denying the injunction would not irreparably harm the appellants. For the reasons set forth above and in the well-reasoned District Court opinion, we will affirm the District Court's denial of the requested preliminary injunction.